# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MINNESOTA

| | |
|---|---|
| SUSANNE MEHLMAN and JOY HULTMAN, on behalf of themselves and all others similarly situated, | Case No. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| AMERIPRISE FINANCIAL, INC., AMERIPRISE FINANCIAL SERVICES, INC., AMERICAN ENTERPRISE INVESTMENT SERVICES, INC., and AMERIPRISE FINANCIAL SERVICES, LLC., | |
| Defendants. | |

Plaintiffs Susanne Mehlman and Joy Hultman, on behalf of themselves and the proposed Class and Subclass defined herein, seek redress for the harm caused by Defendants' conduct. In support of their Complaint, Plaintiffs allege the following:

### I.      NATURE OF ACTION

1.      This case concerns a simple ruse: instead of fulfilling its fiduciary duties, contractual obligations, and a regulatory mandate to act only in the best interests of their clients, Defendants implement a scheme whereby they use their clients' cash balances to generate massive profits for themselves while shortchanging their clients.

2.     Defendants' misconduct was and continues to be extremely lucrative for Defendants but was and continues to be extremely detrimental to their clients—in flagrant violation of their duties to their clients.

## II.     JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction under the Class Action Fairness Act, codified at 28 U.S.C. § 1332(d). Plaintiffs are diverse from Defendants and the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

4.     This Court has personal jurisdiction over Defendants because they conduct substantial business in this district and have their principal places of business here.

5.     Venue is proper in this district under 28 U.S.C. § 1391.

## III.     PARTIES

### A.     Plaintiffs

6.     Plaintiff Susanne Mehlman is a citizen of Maryland who maintains retirement, advisory, and traditional brokerage accounts with Defendants Ameriprise Financial Services, LLC ("AFS LLC"), Ameriprise Financial Services, Inc. ("AFS Inc."), and American Enterprise Investment Services, Inc. ("AEIS").

7.     Plaintiff Joy Hultman is a citizen of Florida who maintains retirement, advisory, and traditional brokerage accounts with AFS LLC, AFS Inc., and AEIS.

### B.     Defendants

8.     Defendant Ameriprise Financial, Inc. ("AFI") is incorporated in Delaware and maintains its principal place of business in Minneapolis, Minnesota.

9.      Through its wholly owned subsidiaries, including AFS LLC, AFS Inc, and AEIS, AFI provides financial consulting, wealth management, and advisory services to Plaintiffs and other members of the proposed Class.

10.      Defendant AEIS is incorporated in Minnesota and maintains its principal place of business in Minneapolis, Minnesota.

11.      AEIS is a registered broker-dealer with the Securities and Exchange Commission ("SEC"), and it provides wealth management services to Ameriprise's clients.

12.      Defendant AFS Inc. is incorporated in Delaware and maintains its principal place of business in Minneapolis, Minnesota.

13.      AFS Inc. is a registered broker-dealer with the SEC, and it provides wealth management services to Ameriprise's clients.

14.      AFS Inc. is a registered investment adviser with the SEC, and its relationship with its clients is subject to the fiduciary, contractual, and other obligations imposed on investment advisers.

15.      Defendant AFS LLC is a Delaware limited liability company that maintains its principal place of business in Minneapolis, Minnesota.

16.      AFS LLC is a registered broker-dealer with the SEC, and it provides wealth management services to Ameriprise's clients.

17.      AFS LLC is a registered investment adviser with the SEC, and its relationship with its clients is subject to the fiduciary, contractual, and other obligations imposed on investment advisers.

18. As used herein, the term "Ameriprise" collectively refers to AFI, AEIS, AFS Inc., and AFS LLC.

## IV. FACTUAL ALLEGATIONS

19. Ameriprise is a "a diversified financial services company" that has "$1.4 trillion in assets under management and administration. . . ."[1] Ameriprise's website boasts that it is "Celebrating 130 years of putting clients first."[2]

20. A significant source of income for Ameriprise is net interest income. Net interest income is the difference between the amount of interest that Ameriprise pays to or secures for the benefit of its brokerage and advisory clients and the amount of interest that Ameriprise and its affiliates earn on those cash balances themselves.

21. Ameriprise, like many financial services companies, offers cash sweep programs to its clients. Cash sweep programs figuratively "sweep" clients' uninvested cash balances into interest-bearing accounts at a network of banks.

22. As described more fully below, Ameriprise makes more money when its clients' funds are invested in the Ameriprise cash sweep program rather than in similar cash options and equivalents. Moreover, when clients are in the Ameriprise cash sweep program, Ameriprise pays and/or secures interest rates on the client's cash balances that are neither reasonable nor in compliance with its legal duties.

---

[1] Ameriprise Financial, Inc., 2023 Annual Report (Form 10-K) at 1, 3 (Feb. 22, 2024).

[2] AMERIPRISE FINANCIAL, https://www.ameriprise.com/ (last visited July 26, 2024).

**A. Ameriprise's Sweep Accounts**

23.     Ameriprise has a primary cash sweep program for its brokerage and advisory

clients known as its "Ameriprise Insured Money Market Account" ("AIMMA"). According

to Ameriprise,

> AIMMA is an interest-bearing bank deposit arrangement available in
> Ameriprise brokerage accounts that provides liquidity and cash you
> can use for everyday transactions. With AIMMA as your sweep
> option, uninvested cash in your brokerage account is deposited at one
> or more banks to offer enhanced FDIC coverage–up to $2.5 million in
> FDIC insurance coverage per depositor.[3]

24.     For its AIMMA, Ameriprise has 23 participating "Program Banks."[4] The

Program Banks include Ameriprise Bank.

25.     When an Ameriprise client elects to participate in AIMMA, Ameriprise client

cash funds are initially deposited with Ameriprise Bank.

26.     If a client's cash funds exceed the FDIC limit in Ameriprise Bank,

Ameriprise then "sweeps" client cash funds to one of its non-affiliated Program Banks.[5]

---

[3] *Brokerage Sweep and Rates*, AMERIPRISE FINANCIAL,
https://www.ameriprise.com/products/cash-cards-lending/brokerage-sweep-options (last
visited July 26, 2024).

[4] AMERIPRISE FINANCIAL, *Ameriprise Insured Money Market Account (AIMMA) Bank
List*, https://www.ameriprise.com/binaries/content/assets/ampcom/wcm/AMP_
AIMMABANKLIST.PDF (last visited July 26, 2024).

[5] AMERIPRISE FINANCIAL, *Form 402469 – Other Important Brokerage Disclosures*, at 4–
5, https://www.ameriprise.com/binaries/content/assets/ampcom/wcm/AMP_ 402469.pdf
(last visited July 26, 2024).

27.     If a client's cash exceeds FDIC limits at all the Program Banks, then the excess amount will continue to be invested in the deposit accounts of certain Program Banks that are known as "Excess Banks."

28.     Ameriprise also offers an "Ameriprise bank insured sweep account" ("ABISA"). If clients choose ABISA as their sweep option, then all uninvested cash in their brokerage accounts is deposited with Ameriprise Bank. According to Ameriprise,

> ABISA is an interest-bearing bank deposit arrangement … that provides liquidity and cash you can use for investment transactions. With ABISA as your sweep option, uninvested cash in your brokerage account is deposited at Ameriprise Bank, FSB and offers up to $250,000 in FDIC insurance coverage per depositor.[6]

29.     ABISA and AIMMA are referred to collectively as the "Sweep Accounts."

30.     Ameriprise fails to pay or secure for its clients a reasonable rate of interest on the cash balances in its Sweep Accounts.

31.     As of June 18, 2024, the interest rates Ameriprise paid to its clients in the Sweep Accounts deposits were:[7]

---

[6] *Brokerage Sweep and Rates*, AMERIPRISE FINANCIAL, https://www.ameriprise.com/products/cash-cards-lending/brokerage-sweep-options (last visited July 26, 2024).

[7] *Id*. (as of July 26, 2024).

| From | To | Annual Percentage Yield |
|---|---|---|
| $5 million | and above | 2.18% |
| $1 million | $4,999,999 | 1.88% |
| $500,000 | $999,999 | 0.85% |
| $250,000 | $499,999 | 0.65% |
| $100,000 | $249,999 | 0.50% |
| $50,000 | $99,999 | 0.30% |
| $25,000 | $49,999 | 0.30% |
| $5,000 | $24,999 | 0.30% |
| $0 | $4,999 | 0.30% |

32.     The interest rates Ameriprise pays to its clients in the Sweep Accounts violate Ameriprise's duties to its clients because the rates are not reasonable, which constitutes a breach of Ameriprise's fiduciary and contractual duties to its clients and a violation of Regulation Best Interest, 17 CFR § 240.15l-1 (2019) (hereinafter "Reg. BI").

**B.      Ameriprise's Duties to Its Clients**

33.     Ameriprise owes varying duties to each client based on the type of relationship it has with the client.  For example:

    a.   for all retail advisory accounts, Ameriprise is required to act as a fiduciary to its clients, requiring it to only act for the benefit of its clients and not its own self-interest;

    b.   for all retail client accounts, Ameriprise is required to always act in the "best interests" of its clients, regardless of whether the account was qualified (i.e., eligible for certain tax treatment under federal law) or not, or advisory or retail brokerage; and

c.  for all retail retirement accounts, including traditional, Roth, and Simple Individual Retirement Accounts ("IRAs"), Ameriprise is contractually obligated to pay its clients a "reasonable rate of interest" on the clients' cash balances.

**1.  Ameriprise's Fiduciary Duties**

34.  When Ameriprise acts as an Investment Adviser for actively managed funds, it owes its clients a fiduciary duty. *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 33689 (July 12, 2019) ("Under federal law, an investment adviser is a fiduciary.").

35.  "The Advisers Act establishes a federal fiduciary duty for investment advisers. This fiduciary duty is based on equitable common law principles and is fundamental to advisers' relationships with their clients under the Advisers Act." *Id.* at 33670.

36.  Under this federal duty, Ameriprise "must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. In other words, the investment adviser cannot place its own interests ahead of the interests of its client." *Id.* at 33671.

37.  If there is a conflict between Ameriprise's interests and its client's interests, then Ameriprise is also required to "eliminate or make full and fair disclosure of all conflicts of interest which might incline an adviser—consciously or unconsciously—to render advice which is not disinterested such that a client can provide informed consent to the conflict." *Id.*

38.     Ameriprise "must make full and fair disclosure to its clients of all material facts relating to the advisory relationship." *Id.* at 33675.

### 2.     Ameriprise's Duties Under Regulation Best Interest

39.     Where Ameriprise is not acting as an Investment Adviser and is instead acting in its capacity as a broker-dealer, it is obligated to act in its clients' best interests under Reg. BI.

40.     While the Investment Adviser's fiduciary duty obligations apply to all investment advisory clients, Reg. BI applies only to retail investors, defined as "a natural person, or the legal representative of such person who (i) [r]eceives a recommendation of any securities transaction or investment strategy" and "(ii) [u]ses the recommendation primarily for personal, family, or household purposes." 17 C.F.R. § 240.15l-1(b)(1).

41.     Although there are technical differences between Reg. BI duties and an Investment Adviser's fiduciary obligations, "they generally yield substantially similar results in terms of the ultimate responsibilities owed to retail investors."[8]

42.     Indeed, Reg. BI was drafted "to draw on key principles underlying fiduciary obligations, including those that apply to investment advisers under the Advisers Act, while providing specific requirements to address certain aspects of the relationships between broker-dealers and their retail clients." 84 Fed. Reg. 33318, 33320 (July 12, 2019).

---

[8] *See Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Care Obligations*, U.S. SECURITIES & EXCHANGE COMMISSION (June 7, 2024), www.sec.gov/tm/standards-conduct-broker-dealers-and-investment-advisers.

43.     Under Reg. BI, regardless of whether an investor chooses a broker-dealer or an investment adviser (or both), the investor "will be entitled to a recommendation . . . or advice . . . that is in the best interest of the retail investors and that does not place the interests of the firm or the financial professional ahead of the interests of the retail investor." *Id*. at 33321.

44.     Reg. BI consists of a "General Obligation," which states, "When making a recommendation, a broker-dealer must act in the retail customer's best interest and cannot place its own interests ahead of the customer's interests." *Id.* at 33320.

45.     Within the General Obligation are more specific duties, including disclosure duties and a duty to avoid and disclose conflicts of interest.

46.     These latter duties require disclosure of "all material facts relating to conflicts of interest . . . that might incline a broker-dealer to make a recommendation that is not disinterested, including, for example, conflicts associated with proprietary products, payments from third parties, and compensation arrangements." *Id.* at 33321.

47.     Part of a broker-dealer's obligation under Reg. BI is to "consider reasonable alternatives, if any, offered by the broker-dealer in determining whether it has a reasonable basis for making the recommendation." *Id.*

48.     One component of a broker-dealer's duty to disclose conflicts of interest concerns compensation. "The receipt of higher compensation for recommending some products rather than others, whether received by the broker-dealer, the associated person, or both, is a fundamental and powerful incentive to favor one product over another." *Id.* at 33364.

49.     Thus, under Reg. BI, Ameriprise was and is obligated to elevate its clients' interests above its own, to avoid conflicts with clients' interests, and to disclose material facts concerning any conflicts that may exist.

50.     Ameriprise touts its obligations under Reg. BI and explains that the "Best Interest Standard of Care" is "[o]ur commitment to act in your best interest and not place our interests ahead of yours," including in a managed or brokerage account.[9]

51.     Ameriprise also states that "your financial advisor must act in your best interest at the time the recommendation is made," taking into account the "costs of reasonably available alternatives we offer."[10]

### 3.     Ameriprise's Duty to Secure Reasonable Interest Rates for Retirement Accounts

52.     For client cash balances maintained in retirement accounts (regardless of whether the accounts are advisory or brokerage in nature), Ameriprise may utilize those cash balances for investments or loans but only if it pays the client a "reasonable rate" of interest on those cash balances.

53.     For example, section 4975 of the Internal Revenue Code imposes a tax on "prohibited transactions" and applies when a plan sponsor for an IRA engages in

---

[9] AMERIPRISE FINANCIAL, *Form 116188–Working in your best interest, Regulation Best Interest and your brokerage relationship with Ameriprise Financial*, at 1, https://www.ameriprise.com/binaries/content/assets/ampcom/legal/regbi.pdf (last visited July 26, 2024).

[10] *Id.*

transactions with a "disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account." 26 U.S.C. § 4975.

54.     A "disqualified person" includes companies or individuals "providing services to the plan." 26 U.S.C. § 4975(e)(2)(B). This would include non-Ameriprise entities, such as the 22 other Program Banks besides Ameriprise Bank that receive deposits swept from Ameriprise client accounts.

55.     Notwithstanding these "prohibited transactions," the IRS code provides several safe harbors, one of which is "the investment of all or part of a plan's assets in deposits which bear a reasonable interest rate in a bank or similar financial institution." 26 U.S.C. § 4975(d)(4).

56.     Thus, while Ameriprise is allowed to invest all or part of a client's cash balances maintained in retirement accounts in Sweep Accounts, those cash balances must "bear a reasonable interest rate." 29 U.S.C. § 4975(d)(4); 26 CFR § 54.4975-6. The objective of this provision is to ensure that related party transactions—i.e., transactions between a plan sponsor (Ameriprise) and a service provider (the Program Banks)—concerning retirement accounts are priced at fair market rates.

57.     Treasury regulations extend this same obligation to situations when Ameriprise "invests plan assets in deposits in itself or its affiliates." 26 CFR § 54.5975-6(b)(3)(i). When this occurs, the client's authorization "must name" the institution and "must state that [the bank] may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)." *Id.*

58.     Similarly, and like the IRS Code, ERISA also exempts from prohibition various interested party transactions that "bear a reasonable rate of interest." 29 U.S.C. § 1108(b)(1)(D).

59.     Ameriprise's client contracts concerning its IRAs incorporate these government-mandated "reasonable rate" benchmarks.

60.     For example, as part of Ameriprise's Traditional IRA plan (sponsored by AFS LLC), the client authorizes Ameriprise to deposit or invest cash balances in "in deposits of itself or its affiliates, including Ameriprise Bank, FSB, that bear a reasonable rate of interest . . . ." Ameriprise Custom Advisory Relationship Agreement at ¶ 12.

61.     In sum, under the common law fiduciary standard, Reg. BI, and Ameriprise's own contracts incorporating the federal statutory requirements, Ameriprise has a duty to act in the best interests of its clients and to secure reasonable interest rates for its clients' cash balances through a reasonable cash sweep program or reasonable cash equivalents— such as government money market funds available to Ameriprise clients.

### C.     Ameriprise Breaches Its Duties and Profits Thereby

62.     Ameriprise breaches its duties to secure reasonable interest rates for its clients' deposits.

63.     Although the term "reasonable" is not defined in Ameriprise's contracts, according to the term's dictionary definition, it is synonymous with "fair" and "proper."[11]

64.     IRS regulations define an "arm's-length interest rate" as:

---

[11] *See* Reasonable, Black's Law Dictionary (11th ed.).

a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances.

26 CFR § 1.482-2(a)(2).

65.     In 2003, the Department of Labor issued an exemption to certain transaction restrictions in ERISA and, in granting the exemption, provided the following definition of a "reasonable" rate of interest:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other clients of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

68 Fed. Reg. 34646, at 34648 (June 10, 2003).

66.     Ameriprise did not pay reasonable rates of interest to Plaintiffs and proposed Class members.

### 1.     Sweep Account Rates Paid by Other Institutions

67.     The rates offered by Ameriprise through its Sweep Accounts are significantly lower than sweep programs at other brokerage and advisory firms. For example, the following chart compares Ameriprise's Sweep Account rates with those of two comparable programs:

| Cash Balance | Ameriprise's Sweep Accounts Rate | Vanguard Sweep Rate[12] | InteractiveBrokers Sweep Rate[13] |
|---|---|---|---|
| Less than $100,000 | 0.30% | 4.6% | 4.83% |
| Between $100,000 and $249,999 | 0.50% | 4.6% | 4.83% |
| Between $250,000 and $499,999 | 0.65% | 4.6% | 4.83% |
| Between $500,00 and $1 million | 0.85% | 4.6% | 4.83% |

68. Thus, other brokerage and advisory financial institutions that use sweep programs pay or secure significantly higher rates than Ameriprise.

### 2. Money Market Fund Rates

69. Money market fund rates also provide a benchmark for determining what does or does not constitute a "reasonable rate."

70. Ameriprise's default position is to place clients in low-rate cash sweep programs. Although Ameriprise also offers a government money market fund (Dreyfus) for cash sweep, a client must specifically request it, unlike Fidelity and Vanguard, which automatically sweep client funds into government money market funds. The Dreyfus

---

[12] *See Vanguard Cash Plus Account*, VANGUARD, https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account (last visited June 20, 2024).

[13] *See Safeguard Your Assets with Our Insured Bank Deposit Sweep Program*, INTERACTIVEBROKERS, https://www.interactivebrokers.com/en/accounts/sweep-program.php (last visited June 20, 2024); *Interest Rates*, INTERACTIVEBROKERS, https://www.interactivebrokers.com/en/accounts/fees/pricing-interest-rates.php, (last visited June 20, 2024).

money market fund for Ameriprise brokerage and advisory clients pays significantly higher rates than Ameriprise's Sweep Accounts.

71.     Other brokerage and advisory firms offer money market funds comparable to the Ameriprise Dreyfus money market fund for clients' cash balances, paying similar interest rates.

72.     Some of Ameriprise's competitors automatically sweep any uninvested cash deposited into their clients' brokerage accounts into money market funds that earn comparably high rates of interest.[14]

73.     The unreasonableness of the rates Ameriprise pays to or secures for its clients' cash balances is particularly evident in light of the management fees that Ameriprise charges its clients to "manage" the client cash swept into its Sweep Accounts. For example, as noted above, for client cash balances that are less than $500,000, Ameriprise secures tiered stages of declining interest rates, starting at 0.65%, down to 0.30% (for deposits of less than $100,000). In stark contrast, Ameriprise and its advisors charge an annual management fee on the cash balances equal to approximately 1.0%. In this scenario, an investor who maintains $99,999 in her sweep account, would only earn 0.30% on her investment, while her investment advisor takes a 1.0% fee for "managing" that investment.

---

[14] For example, by default, Fidelity sweeps uninvested cash in their clients' brokerage accounts into a money market fund earning 4.96%. *See Help our cash work harder,* FIDELITY, https://www.fidelity.com/go/manage-cash-rising-costs, (last visited June 20, 2024).

74.     Ameriprise has devised a scheme in which Ameriprise makes significant profits on advisory customer cash balances, while the advisory clients, to whom a fiduciary duty is owed, *actually loses money on their cash balances*.

### D.     Ameriprise Benefits from Its Misconduct

75.     In general, Ameriprise earns interest revenue on non-trading assets that it holds for its clients; this includes cash deposits and other capital that is not deployed for trading purposes.

76.     Ameriprise earns this revenue under its AIMMA program based on agreements with its Program Banks, where each Program Bank compensates Ameriprise based on the average daily deposit balances at the Program Bank, and that total compensation paid is based on the Federal Funds rate plus up to a 50 basis point (i.e., 0.50%) premium.[15]

77.     The Federal Funds 30-day average rate has been over 4.12% since January 1, 2023—and as of June 20, 2024 was 5.33%.[16]

78.     However, Ameriprise only pays its clients that have deposited cash with the company the negligible yield reflected in its Sweep Accounts. The difference between what Ameriprise earns on its own deposits and what it pays its clients is the company's net interest income.

---

[15] Under Ameriprise's ABISA program, Ameriprise Bank only reimburses Ameriprise for its direct out of pocket expenses, and Ameriprise Bank uses the net interest spread to earn additional revenue.

[16] *Effective Federal Funds Rate*, FEDERAL RESERVE BANK OF NEW YORK, https://www.newyorkfed.org/markets/reference-rates/effr (last visited June 20, 2024).

79.    Much of Ameriprise's net interest income is generated by its wealth management business—a business unit that provides investment-related advice and services for customer funds and serves as a broker-dealer for Ameriprise clients.

80.    Ameriprise's net revenue is heavily impacted by its net interest income. According to Ameriprise's own analysis, a change in interest rates may cause significant change in the company's net interest income. For example, the table below reflects Ameriprise's estimated impact in 2022 on interest rates increasing 100 basis points.[17]

| Interest Rate Increase 100 Basis Points | Interest Rate Exposure to Pretax Income | | |
|---|---|---|---|
| | Before Hedge Impact | Hedge Impact | Net Impact |
| | | (in millions) | |
| Asset-based management and distribution fees [(1)] | $ (53) | $ — | $ (53) |
| Variable annuity and structured variable annuity benefits: | | | |
| Market risk benefits | 1,484 | (1,028) | 456 |
| Indexing feature for structured variable annuities | (29) | 82 | 53 |
| Total variable annuity and structured variable annuity benefits | 1,455 | (946) | 509 |
| Fixed annuities, fixed insurance and fixed portion of variable annuities and variable insurance products | 25 | — | 25 |
| Banking deposits | 28 | — | 28 |
| Brokerage client cash balances | 146 | — | 146 |
| Certificates | (9) | — | (9) |
| IUL insurance | 12 | 1 | 13 |
| Total | $ 1,604 | $ (945) | $ 659 |

81.    And the table below reflects Ameriprise's estimated impact in 2023 on interest rates increasing 100 basis points.[18]

---

[17] Ameriprise Financial, Inc., 2023 Annual Report (Form 10-K) at 67 (Feb. 22, 2024).

[18] *Id.* at 66.

| Interest Rate Increase 100 Basis Points | Interest Rate Exposure to Pretax Income | | |
| --- | --- | --- | --- |
| | Before Hedge Impact | Hedge Impact | Net Impact |
| | | (in millions) | |
| Asset-based management and distribution fees [1] | $ (60) | $ — | $ (60) |
| Variable annuity and structured variable annuity benefits: | | | |
| Market risk benefits | 1,404 | (1,056) | 348 |
| Indexing feature for structured variable annuities | 6 | 127 | 133 |
| Total variable annuity and structured variable annuity benefits | 1,410 | (929) | 481 |
| Fixed annuities, fixed insurance and fixed portion of variable annuities and variable insurance products | 43 | — | 43 |
| Banking deposits | 27 | — | 27 |
| Brokerage client cash balances | 53 | — | 53 |
| Certificates | 2 | — | 2 |
| IUL insurance | 14 | 1 | 15 |
| Total | $ 1,489 | $ (928) | $ 561 |

82.     Thus, under Ameriprise's own analysis, an interest rate increase of 100 basis points from 2022 to 2023 would result in an estimated $1.22 billion increase in revenue for Ameriprise.

83.     Ameriprise flags fluctuating interest rates as a major revenue risk. As Ameriprise states, "Our results of operations and financial condition may be materially affected by market fluctuations and by economic and other factors . . . including equity prices [and] interest rates."[19]

84.     Indeed, changes in interest rates mean that Ameriprise's clients may decrease their cash deposits. Ameriprise states that when interest rates are low, its clients may "reduce the aggregate amount of managed assets or shift their funds to other types of accounts with different fee rate structures" due to "changes in prevailing interest rates."[20]

85.     Thus, Ameriprise has a significant financial interest in (1) not paying clients a reasonable interest rate and keeping as much of the "spread" as it can, and simultaneously

---

[19] *Id.* at 16.

[20] *Id.* at 17.

(2) not disclosing to its clients the unreasonable interest rates it pays (as well as the company's inherent conflict of interests), lest the clients pursue accounts with reasonable rates at other institutions.

### E.    Ameriprise's Misconduct Damaged Plaintiffs

86.    Susanne Mehlman and Joy Hultman each maintain their own Ameriprise accounts.

87.    Mrs. Mehlman and Mrs. Hultman both maintained retirement, advisory, and traditional brokerage accounts.

88.    For one of Mrs. Hultman's IRA accounts (ending in 33) Ameriprise was designated as an Investment Advisor, meaning the company owed the highest fiduciary duty for that fund.

89.    Similarly, for one of Mrs. Mehlman's IRA accounts (ending in 33) Ameriprise was designated as an Investment Advisor, meaning the company owed the highest fiduciary duty for that fund.

90.    For all of Plaintiffs' other accounts, Ameriprise was required to comply with Reg. BI.

91.    In all the various accounts Plaintiffs maintained with Ameriprise, Plaintiffs' cash balances were swept into Ameriprise's Sweep Accounts.

92.    In all of the various accounts Plaintiffs maintained with Ameriprise, the interest rates Plaintiffs received on their Sweep Accounts was unreasonable.

93.    Ameriprise's conduct damaged Plaintiffs, and unjustly enriched Ameriprise.

## V. CLASS ACTION ALLEGATIONS

94.     Plaintiffs re-allege and incorporate by reference the allegations set forth above.

95.     Plaintiffs bring this class action and seek certification of the following Class:

> Retail clients of Ameriprise who had cash deposits or balances in Ameriprise's Sweep Accounts.

96.     Plaintiffs also bring this class action and seek certification of the following Sub-Class (the "IRA Subclass"):

> Retail clients of Ameriprise who had cash deposits or balances in Ameriprise's Traditional IRA or Roth IRA accounts.

97.     Plaintiffs reserve the right to amend the Class and IRA Subclass definitions if further investigation and discovery indicates that the Class and IRA Subclass definitions should be narrowed, expanded, or otherwise modified.

98.     Excluded from the Class are governmental entities, institutional and other non-retail investors; Ameriprise and any of its affiliates, legal representatives, employs, or officers; the judicial officer(s) and any judicial staff overseeing this litigation; and counsel for Plaintiffs and the proposed Class, including other attorneys and staff at each respective firm.

99.     This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

### Numerosity
### Rule 23(a)(1)

100.    Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiffs at this

time. However, Ameriprise's wealth management services provide financial planning and advisory services to over 2 million client accounts with over 10,000 financial advisors.[21] Accordingly, Plaintiffs and the Class satisfy the numerosity requirement of Rule 23. Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

### Existence and Predominance of Common Questions of Law and Fact
### Rule 23(a)(2), 23(b)(3)

101.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

   a.   whether Ameriprise's interest rates are "reasonable";

   b.   whether Ameriprise owed a fiduciary duty to the Class, and whether Ameriprise violated that duty;

   c.   whether Ameriprise owed a duty to the Class pursuant to Reg. BI, and whether Ameriprise violated that duty;

   d.   whether Ameriprise owed a duty to the Class related to its IRA programs offered to retail clients (including Ameriprise's contractually-agreed-to duty), and whether Ameriprise violated that duty;

---

[21]    *About Ameriprise Financial*, AMERIPRISE FINANCIAL, https://www.ameriprise.com/about (last visited July 26, 2024); *Company Information*, AMERIPRISE FINANCIAL, https://www.ameriprise.com/about/our-company (last visited July 26, 2024).

e.   whether Ameriprise breached the contractual terms of its IRA programs;

f.   whether Ameriprise was unjustly enriched by its wrongful conduct;

g.   whether and to what extent Class members are entitled to damages and other monetary relief; and

h.   whether and to what extent Class members are entitled to attorneys' fees and costs.

## Typicality
### Rule 23(a)(3)

102.   Plaintiffs' claims are typical of the Class's claims because they were retail account holders with Ameriprise who were paid an unreasonable interest rate. Thus, Plaintiffs' claims are typical of other Class members' claims as they arise from the same course of conduct by Defendants, and the relief sought is common to Class members.

## Adequacy of Representation
### Rule 23(a)(4)

103.   Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

## Superiority
### Rule 23(b)(3)

104.   A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense

required for each Class member to individually litigate their claims against Defendants. It would thus be virtually impossible for Class members, on an individual basis, to obtain effective redress for the wrongs done them.

105. Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

106. Superiority is particularly satisfied in these circumstances, where the law of a single state will apply to all state law claims. Under the uniform contract terms with Ameriprise, the law of Minnesota will apply to each Class member's state law claims, allowing the Court to adjudicate the claims of all Class members under a single state analysis.

107. Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

    a. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Breach of Fiduciary Duty**
**Brought on behalf of the Class against All Defendants**

108.   Plaintiffs, on behalf of themselves and the Class, hereby re-allege the paragraphs above as if fully set forth herein.

109.   Under the Investment Advisers Act and at common law, Ameriprise owed fiduciary duties to Class members who maintained managed accounts within the purview of the Investment Advisers Act.

110.   Under Reg. BI, Ameriprise owed duties to Class members who maintained non-managed accounts (including IRAs), and those duties are tantamount to fiduciary obligations for the purposes of this litigation.

111.   These duties include, but are not limited to:

a. a duty of loyalty;

b. a duty to act in the best interests of its clients;

    c.   a duty not to place Ameriprise's interests above those of its clients;

    d.   a duty to avoid conflicts of interest; and

    e.   a duty to disclose any conflicts of interest.

112.    Ameriprise violated each of the foregoing duties when it (1) failed to pay the Class a reasonable rate of interest; (2) failed to act in the clients' best interests by not providing a reasonable default for cash balances that paid its clients a reasonable rate of interest on cash balances; (3) placed its own interests in realizing financial gain from net interest income ahead of the Class's interest in obtaining a reasonable rate of interest; (4) maintained and failed to disclose its conflict of interest in securing increased net interest income at the expense of its clients.

113.    Ameriprise's conduct damaged Plaintiffs and the Class.

114.    Plaintiffs, individually and on behalf of the Class, seek all damages permitted by law.

## SECOND CLAIM FOR RELIEF
### Unjust Enrichment
**Brought on behalf of the Class against All Defendants**

115.    Plaintiffs, on behalf of themselves and the Class, hereby re-allege the paragraphs above as if fully set forth herein.

116.    As a result of Ameriprise's wrongful conduct, Plaintiffs and the Class received lower interest payments on their cash and other deposits than they would have in a reasonable and fair market.

117.    As a result of Ameriprise's wrongful conduct, Ameriprise was unjustly enriched and Plaintiffs and the Class conferred a benefit upon Ameriprise because it

received significantly greater net interest income than it would have but for its wrongful conduct.

118.    Ameriprise appreciated, knowingly accepted, and retained the non-gratuitous benefits conferred by Plaintiffs and the Class.

119.    It would be inequitable and unjust for Ameriprise to retain these wrongfully obtained profits.

120.    Ameriprise's retention of this wrongfully-obtained net interest income would violate the fundamental principles of justice, equity, and good conscience.

121.    Plaintiffs and the Class are entitled to restitution and disgorgement of the profits unjustly obtained, plus interest.

## THIRD CLAIM FOR RELIEF
### Breach of Contract—Express Provisions
### Brought on behalf of the IRA Subclass against All Defendants

122.    Plaintiffs, on behalf of themselves and the IRA Subclass, hereby re-allege the paragraphs above as if fully set forth herein.

123.    Ameriprise's governing documents related to its IRAs constitute a valid and binding agreement between Ameriprise and its IRA accountholders.

124.    The governing documents require Ameriprise to pay a "reasonable rate of interest" on cash deposits or balances maintained in the IRAs.

125.    Ameriprise failed to pay a "reasonable rate of interest" on those deposits; therefore, Ameriprise breached its contracts with Plaintiffs.

126.    Ameriprise's conduct damaged Plaintiffs and the IRA Subclass.

127.    Plaintiffs, individually and on behalf of the IRA Subclass, seek all damages permitted by law.

## VII.   DEMAND FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class (including the IRA Subclass), demand judgment and relief as follows:

A.    For an order certifying the proposed Class and IRA Subclass, and appointing Plaintiffs and their counsel to represent the proposed Class;

B.    For an order awarding Plaintiffs and Class members damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

C.    For an order awarding Plaintiffs and Class members restitution, disgorgement, or such other and further relief as the Court deems proper; and

D.    For an order awarding Plaintiffs and the Class reasonable attorneys' fees and costs of suit, including expert witness fees.

## VIII.  JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and the Class (including the IRA Subclass), demand a trial by jury on all issues so triable.

DATED: July 29, 2024

Respectfully submitted,


/s/Daniel E. Gustafson
Daniel E. Gustafson (#202241)
Karla M. Gluek (#0238399)
Bailey Twyman-Metzger (#0400179)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
btwymanmetzger@gustafsongluek.com

Matthew L. Dameron (*pro hoc vice forthcoming*)
Clinton J. Mann (*pro hoc vice forthcoming*)
**WILLIAMS DIRKS DAMERON LLC**
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone:        (816) 945-7110
Facsimile:        (816) 945-7118
matt@williamsdirks.com
cmann@williamsdirks.com

Thomas I. Sheridan, III (*pro hoc vice forthcoming*)
Sona R. Shah (*pro hoc vice forthcoming*)
**SIMMONS HANLY CONROY LLC**
112 Madison Avenue
New York, NY 10016
Telephone:        (212) 784-6404
Facsimile:        (212) 257-8482
tsheridan@simmonsfirm.com
sshah@simmonsfirm.com

Bruce D. Oakes (*pro hoc vice forthcoming*)
Richard B. Fosher (*pro hoc vice forthcoming*)
**OAKES & FOSHER, LLC**
1401 Brentwood Boulevard, Suite 250
Saint Louis, Missouri 63144
Telephone:          (314) 804-1412
Facsimile:          (314) 428-7604
boakes@oakesfosher.com
rfosher@oakesfosher.com

***Counsel for Plaintiffs and the Proposed Class***