BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE CASH SWEEP PROGRAMS CONTRACT LITIGATION. | MDL No. 3136 |

**RESPONSE OF DEFENDANTS LPL FINANCIAL LLC AND LPL FINANCIAL HOLDINGS INC. TO PLAINTIFFS' MOTION FOR TRANSFER AND CONSOLIDATION PURSUANT TO 28 U.S.C. § 1407**

Defendant LPL Financial LLC ("LPL") and LPL Financial Holdings Inc. (together with LPL, the "LPL Defendants") respectfully submit this response in opposition to the Motion for Transfer and Consolidation Pursuant to 28 U.S.C. § 1407 ("Motion," Dkt. No. 1) filed by Plaintiffs Safron Capital Corp. and Brickman Investments Inc. ("Moving Parties").

## I.   INTRODUCTION

The LPL Defendants believe there are no substantial common factual issues between the already-consolidated action in which they are defendants and the various other cases covered by the Motion that would warrant centralization in a multi-district litigation ("MDL") proceeding. The central thesis of the Motion—that purported common factual issues relating to alleged failures to pay "reasonable rates of interest" support centralization in an MDL—does not identify a substantial common factual issue at all, particularly with respect to the LPL Defendants. Moreover, MDL treatment would, on balance, be inconvenient and less efficient for the parties and witnesses as compared to litigation in the existing, consolidated case pending against the LPL Defendants in the Southern District of California. The LPL Defendants take no position as to whether centralization of any cases against other parties is warranted.

## II.   RELEVANT FACTS

LPL is the nation's largest independent broker-dealer, a leading investment advisory firm, and a top custodian. As of November 4, 2024, LPL serves more than 23,000 individual financial advisors, including advisors at approximately 1,000 enterprises and at approximately 580 registered investment advisor ("RIA") firms nationwide, who in turn collectively serve millions of customer accounts. *See* LPL Financial Holdings Inc., Quarterly Report on Form 10-Q at 1-2 (Nov. 4, 2024), *available at* https://www.sec.gov/Archives/edgar/data/1397911/000139791124000141/lpla-20240930.htm.

1

The cases subject to the Motion generally complain about the varying interest rates paid on uninvested cash through the various defendants' "bank sweep" programs. As the U.S. Securities and Exchange Commission ("SEC") explains, a bank sweep program "typically involves the automatic transfer (or 'sweep') of cash in the brokerage account into a deposit account at a bank that may or may not be affiliated with the broker-dealer." SEC, *Investor Bulletin: Bank Sweep Programs* (June 5, 2014) (hereafter, "*SEC Investor Bulletin*"), *available at* https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-78 (accessed Nov. 25, 2024). Although such programs have been common in the securities industry for decades, the "terms and conditions of bank sweep programs vary." *Id.*

Three LPL customers ("Plaintiffs") filed separate putative class actions against the LPL Defendants in the Southern District of California (the "District Court"), where one of the LPL Defendants is headquartered, beginning in July 2024. Their complaints claim that the LPL Defendants breached asserted contractual, fiduciary, and other duties to the Plaintiffs in connection with LPL's "Insured Cash Account" ("ICA") and "Deposit Cash Account" ("DCA") bank sweep programs. *See, e.g.*, Motion Ex. 16, at ¶¶ 17-19, 72-99 (Complaint in *White v. LPL Financial Holdings Inc.*, No. 24-cv-1724 (S.D. Cal.)). As alleged in the complaints, the ICA and DCA programs are governed by LPL's contracts with the Plaintiffs, and their operation is detailed in the specific disclosures that LPL makes to its customers. *See, e.g., id.* ¶¶ 19-20, 32-33, 36-37 (allegations regarding contracts and various aspects of ICA and DCA Program Disclosure Booklets). The relevant contracts are governed by Massachusetts law. *Id.* ¶ 34. The interest rates paid vary between the two programs and, within the ICA Program, depending on the amount of cash in the particular customer's account. *See id.* ¶¶ 39-41. Both the ICA and DCA Programs involve movement of customers' uninvested funds between their LPL brokerage accounts and third party banks that are unaffiliated with LPL.

The pending actions against the LPL Defendants were consolidated for pretrial purposes on October 16, 2024 into the first-filed case, which has been re-titled *In re LPL Financial Cash Sweep Litigation*, No. 3:24-cv-01484-TWR-AHG, Dkt No. 30 (S.D. Cal.) (*"In re LPL"*).[1]  On November 12, 2024, the District Court appointed three of Plaintiffs' law firms as Interim Lead Counsel.  (*In re LPL*, Dkt. No. 37.)  Under the schedule established by the District Court, Plaintiffs are to file a Consolidated Complaint by December 12, 2024, and the LPL Defendants are to file their response, which will be a motion to dismiss, by January 13, 2025.  (*In re LPL*, Dkt. No. 30, ¶ 9.)  Proceedings in the District Court have not been stayed pending this Motion.

As alleged in the complaints, LPL's relationship with each of the Plaintiffs is governed by contracts under Massachusetts law and specific disclosures to Plaintiffs regarding the relevant details of the challenged ICA and DCA bank sweep programs.  The Motion does not identify any purported common factual issues presented by LPL's contracts and disclosures and those of the defendants in other cases.  To the contrary, the contracts and disclosures that form the bases of the claims are unique and vary significantly among the firms subject to this Motion.  *See SEC Investor Bulletin*, *supra* (detailing various ways in which the "terms and conditions of bank sweep programs vary").  They share in common only their basic subject matters, which cover fundamentals such as the customers' consent and conditions under which sweep program terms can be changed, as required by SEC regulations.  *See, e.g.*, 17 C.F.R. § 240.15c3-3(j)(2)(ii).  Plaintiffs' claims against LPL are factually unrelated to the claims by Moving Parties (which do not concern LPL at all) and

---

[1]  The original captions of the three cases were *Peters v. LPL Financial LLC*, No. 3:24-cv-01228-TWR-AHG (S.D. Cal. filed July 17, 2024); (ii) *Nevitt v. LPL Financial Holdings Inc.*, No. 3:24-cv-01358-TWR-AHG (S.D. Cal. filed July 31, 2024); and (iii) *White v. LPL Financial Holdings Inc.*, 3:24-cv-01724-TWR-AHG (S.D. Cal. filed Sept. 26, 2024).  A fourth case that is covered by the Motion, *Vu v. LPL Financial LLC*, No. 3:24-cv-01484-TWR-AHG (S.D. Cal. filed Aug. 20, 2024) ("*Vu*"), was voluntarily dismissed by the plaintiff on October 10, 2024, 2024.  *Vu*, Dkt. No. 14.  The Moving Parties have not filed suit against the LPL Defendants.

3

the claims by other plaintiffs against other financial institutions covered by the Motion. They merely involve similar subject matters and generally share some common legal issues (although most of them are governed by different states' laws). There is no overlap among *any* of the alleged putative classes, unless it is by irrelevant coincidence (*e.g.*, where an investor happens to be a customer of more than one defendant and participated in bank sweep programs at both firms).

The defendants in the other cases covered by the Motion are competitors of LPL to varying extents, but most of them have substantially different business models from LPL (and from each other)—in respects that will become relevant to these actions if any claims survive dismissal. For example, most of LPL's 23,000 registered financial advisors have only an independent contractor relationship with LPL, which serves as a platform provider to their widely divergent businesses and customer bases. Those LPL financial advisors are typically employed by an independent financial services firm (of which many are proprietors) and/or an independent SEC-registered investment advisor that uses LPL's platform for custody of customer assets and transaction execution and clearing. As a result, there is tremendous diversity in LPL's financial advisor base, their particular approaches to providing investment-related services, the types of customers they serve, and the reasons why particular customers may choose to participate in the ICA or DCA Programs. By contrast, several of the defendants in the other actions covered by the Motion are traditional "wirehouses" that employ all of their individual financial professionals, have substantially different policies and procedures from LPL, and are to differing degrees vertically and horizontally integrated with affiliated banks and investment product sponsors. As noted above, LPL is also independent from any banks involved in the ICA or DCA Programs or sponsors of the investment products that are available through its platform, and does not have an affiliated bank where uninvested cash is deposited in a sweep program. This fact too sets LPL apart from

most of the other cases subject to the Motion and makes certain of the factual allegations in other cases entirely irrelevant to LPL.

### III.  THE MOTION SHOULD BE DENIED.

The Panel may transfer civil actions pending in different districts to a single district court for coordinated pretrial proceedings, provided that: (i) the actions involve "one or more common questions of fact"; (ii) transfer will further "the convenience of the parties and witnesses"; and (iii) transfer "will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). Each of these factors weighs heavily against consolidation as to the *In re LPL* action.

The party seeking consolidation bears the burden of showing Section 1407's requirements have been met. *See, e.g.*, *In re Best Buy Co., Inc., Cal. Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1379 (J.P.M.L. 2011). That burden is significant—the Panel has made clear that Section 1407 "should be the last solution" after considered review of all other options. *In re Gerber Probiotic Prods. Mktg. & Sales Practices Litig.*, 899 F. Supp. 1378, 1379 (J.P.M.L. 2012) (quoting *In re Best Buy*, 804 F. Supp. 2d at 1378). The Motion says nothing about the *In re LPL* action other than its general subject matter, however, and fails to carry Moving Parties' burden as to any of the statutory requirements.

***There Are No Substantial Common Questions of Fact***. Rather than identifying any substantial common factual issue among the many cases, the Motion seeks industry-wide treatment of non-overlapping putative class actions against diverse financial institutions that Moving Parties claim "share a common core of operative factual allegations based on defendants' failure to pay or secure reasonable interest rates on their cash sweep program[s]." (Mot. at 4.) The Panel regularly denies industry-wide centralization where the respective actions against different, competing defendants present individualized facts and issues, as here. *See, e.g.*, *In re Credit Card Payment Prot. Plan Mktg. & Sales Pracs. Litig.*, 753 F. Supp. 2d 1375, 1376 (J.P.M.L. 2010)

5

(denying industry-wide centralization of cases alleging "deceptive marketing of defendants' debt cancellation and/or suspension products" where "each defendant appear[ed] to have offered several different products, which were marketed in different ways and subject to different disclosures"); *In re Spray Polyurethane Foam Insulation Prod. Liab. Litig.*, 949 F. Supp. 2d 1364 (J.P.M.L. 2013) (denying centralization of different manufacturers and installers of different spray polyurethane foam products where individualized facts, e.g., the chemical composition of each product, would predominate).

The Motion does not identify common allegedly breached contract terms, allegedly inadequate disclosures, disputed marketing practices, or any similar common disputed facts between the *In re LPL* case and the others. The Moving Parties do not point any allegedly common false or misleading statements. Nor does their Motion explain why the determination of what might be viewed as a "reasonable rate of interest" is actually a common fact issue, let alone one affecting the LPL Defendants. The opposite is true, for at least two reasons:

- First, many of the other complaints contain allegations to the general effect that the defendants breached contractual promises or representations that certain accounts (typically IRAs) would be paid a "reasonable rate" of interest on uninvested cash in the defendant's bank sweep program. *E.g.*, Mot. Ex. 17, ¶¶ 36, 88, 226-231. There is no such allegation in any complaint against the LPL Defendants, who made no such representation or promise. Instead, the complaints against the LPL Defendants allege that an obligation to pay "reasonable" interest rates arose by operation of law (a disputed legal issue). *See, e.g.*, Mot. Ex. 16, ¶¶ 25-31.
- Second, the Motion fails to establish that what may be a "reasonable rate of interest" for one investor at one defendant institution is necessarily the same for other investors with accounts at other firms. Again, the opposite is true. What may be

6

"reasonable" inherently depends on the relevant circumstances, which requires inquiry into those circumstances as to the particular parties (including, for example, the agreements with and disclosures by that defendant, and how its bank sweep program relates to its overall suite of products, services, and compensation arrangements) and would lead to different outcomes where warranted by different circumstances.

Here, the principal commonality among the cases subject to the Motion is that they allege similar causes of action and claims regarding a bank sweep program. But centralization may be appropriate only to aid in resolving "common questions of *fact*," 28 U.S.C. § 1407(a) (emphasis added), and is generally inappropriate in cases involving common legal questions but disparate factual issues. *See, e.g.*, *In re Supp. Nutrition Assistance Program Litig.*, 619 F. Supp. 3d 1348, 1348-49 (J.P.M.L. 2022) (denying centralization where the principal common questions were "legal rather than factual" and where factual questions were "largely [case]-specific"); *In re Nat'l Ass'n for Advancement of Multijurisdictional Prac. Litig.*, 52 F. Supp. 3d 1377, 1378 (J.P.M.L. 2014) ("common legal questions are insufficient to satisfy Section 1407's requirement of common factual questions."). Here, just as in *In re Baby Food Mktg., Sales Pracs. & Prods. Liab. Litig.*, "[t]he claims against each defendant . . . are likely to rise or fall on facts specific to that defendant," and "[m]uch of the discovery and pretrial practice will be defendant-specific." *See* 544 F. Supp. 3d 1375, 1376-77 (J.P.M.L. 2021).

***Centralization Would Be Relatively Inconvenient and Inefficient.*** The Motion ignores the proceedings to date in the cases against the LPL Defendants, which are already consolidated in one District Court before a single District Judge and would not benefit from the Panel's intervention. Consolidating the *In re LPL* case (which is already complicated enough, given that it combines multiple Plaintiffs with different types of accounts and relationships with LPL) with

7

the pending cases against ten other financial institutions would not improve the convenience or efficiency of the actions for anyone.

As an initial matter, the claims in the cases subject to the Motion do not lend themselves to consolidated briefing of legal issues, dependent as they are on the particular defendants' contracts, disclosures, and applicable law. For example, LPL's agreements with its customers are governed by Massachusetts law, which appears to be at issue in only one of the other cases covered by the Motion. Moreover, it would not improve efficiency or convenience to marry the claims against the LPL Defendants with those in the one case where a defendant has answered, as that case has been pending for more than five years and the factual allegations in that complaint relate to that defendant's particular agreements and practices. *See* Mot. Ex. 17.

If the claims in *In re LPL* survive motions to dismiss, there is likely to be little or no common discovery. Discovery regarding one plaintiff's dealings and agreements with one defendant will be entirely or mostly irrelevant as to other plaintiffs and defendants. *See, e.g.*, *In re COVID-19 Bus. Interruption Prot. Ins. Litig.*, 482 F. Supp. 3d 1360, 1362 (J.P.M.L. 2020) (denying centralization where "[t]here [was] no common defendant in th[e] actions—indeed, there [we]re no true multi-defendant cases," there was "little potential for common discovery," and each case involved different contracts); *In re Secondary Ticket Mktg. Refund Litig.*, 481 F. Supp. 3d 1345, 1346 (J.P.M.L. 2020) (denying centralization because "defendants [we]re separate businesses that employed different [agreements]," there were "no allegations of a conspiracy," "no defendant [was] named in an action alongside another," and "an industry-wide MDL for all three defendants would seem to complicate pretrial proceedings more than it would streamline them").

The same is true of discovery regarding each defendant's internal practices and procedures. The various defendants compete in multiple ways and to varying degrees for personnel and customers, and some have been litigants against each other in cases involving alleged trade secrets

and unfair competition. The necessity for extensive "Attorney Only" discovery could quickly create a morass. As the Panel has recognized, "the introduction of competing defendants into the litigation, and the need to protect trade secret and confidential information from full disclosure to the parties, would complicate case management." *In re Tropicana Orange Juice Mktg. & Sales Pracs. Litig.*, 867 F. Supp. 2d 1341, 1342 (J.P.M.L. 2012). The Panel is therefore "typically hesitant to centralize litigation against multiple, competing defendants which marketed, manufactured, and sold similar products" because consolidation may "complicate case management due to the need to protect trade secret and confidential information" and "prolong pretrial proceedings, because of, *inter alia*, the possible need for separate discovery and motion tracks." *In re CP4 Fuel Pump Mktg. Sales Pracs., & Prod. Liab. Litig.*, 412 F. Supp. 3d 1365, 1367 (J.P.M.L. 2019). That would likely be the result of centralization for the *In re LPL* case.

Centralization certainly would not serve the convenience of the parties and witnesses in the already-consolidated *In re LPL* case. That case is pending in San Diego, where the LPL Defendants have substantial operations. None of the Plaintiffs or their LPL financial advisors is from New York. If centralization is granted, however, the transferee district would depend in part on the "litigation's center of gravity," *In re Nine West LBO Secs. Litig.*, 464 F. Supp. 3d 1383, 1385 (J.P.M.L. 2020), which here means the place where unrelated plaintiffs have chosen to sue unrelated defendants and where more of those unrelated defendants are located. An MDL in the Southern District of New York will serve no convenience for LPL, its witnesses, or the parties.

In sum, there is nothing in the record before the Panel "to overcome [the Panel's] usual reluctance to centralize actions against different defendants in one MDL[.]" *In re CP4 Fuel Pump*, 412 F. Supp. 3d at 1367. Industry-wide, multi-defendant centralization would produce significant inefficiencies and burdens to the transferee court and parties, without any commensurate benefit.

9

## IV. CONCLUSION

The Motion should be denied, at least as to the *In re LPL* case. For the avoidance of doubt, the LPL Defendants take no position on the potential benefits or detriments of centralization as to any other parties, actions, or circumstances other than those now presented.

Dated: November 27, 2024

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By  */s/ Joseph E. Floren*
Joseph E. Floren
joseph.floren@morganlewis.com
Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Tel: (415) 442-1000 / Fax: (415) 442-1001

*Attorney for Defendants LPL Financial LLC and LPL Financial Holdings Inc.*